**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

TRI, Inc.,

Plaintiff,

v.

Boise Cascade Office Products, Inc.,
and Honeywell, Inc.,

Defendants.

Civil No. 00-1464 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

---

William J. Mavity and Pamela M. Miller, Mavity & Associates, Minneapolis, Minnesota, for Plaintiff.

John Harper, III, and Terrance J. Wagener, Krass Monroe P.A., Bloomington, Minnesota, for Defendant Boise Cascade Office Products, Inc.

Robert R. Reinhart and Michael Iwan, Dorsey & Whitney L.L.P., Minneapolis, Minnesota, for Defendant Honeywell, Inc.

---

## Introduction

Before the Court is Defendant Honeywell, Inc.'s ("Honeywell") Motion for Summary Judgment and Defendant Boise Cascade Office Products, Inc.'s ("Boise") Motion to Dismiss Plaintiff TRI, Inc.'s ("TRI") Complaint or, in the Alternative, for Summary Judgment. Boise removed this action from Hennepin County District Court on the basis of federal question jurisdiction and supplemental jurisdiction.



OCT 15 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD OCT 15 2001
DEPUTY CLERK

TRI asserts two federal statutory claims against Honeywell and Boise.[1] First, TRI alleges that Honeywell violated 42 U.S.C. § 1981 by (1) engaging in purposeful racial discrimination against TRI, (2) interfering with TRI's contractual relationship with Boise and (3) interfering with TRI's enjoyment of the benefits, terms and conditions of its contract with Boise. Second, TRI claims that Honeywell and Boise violated § 1 of the Sherman Act by entering into an agreement by which Boise would significantly cut its volume of business with TRI and terminate plans to enter into a national contract with it.

In addition to the federal claims, TRI asserts several state statutory and common law claims against the defendants. TRI alleges that Honeywell violated § 363.03, subd. 8a(c) of the Minnesota Human Rights Act ("MHRA") by intentionally refusing to do business with TRI because of its status as a minority-owned business.[2] TRI also asserts common law claims of tortious interference with contract and prospective business relations against Honeywell. For the reasons set forth below, the Court will grant the defendants' motions.

---

[1] At the hearing on the defendants' motions, counsel for TRI indicated that it was voluntarily dismissing its racial discrimination claims against Boise – namely, the claims under 42 U.S.C. §§ 1981 and 1985 and the claims under the Minnesota Human Rights Act ("MHRA"). Furthermore, counsel for TRI confirmed that TRI is no longer pursuing a 42 U.S.C. § 1985(3) conspiracy claim against Honeywell.

[2] Counsel for TRI also confirmed at the hearing that it was voluntarily dismissing its claims under the Minnesota Human Rights Act against Boise. Furthermore, because the racial discrimination claims against Boise were no longer in the case, TRI was also voluntarily dismissing its "aiding and abetting" claim against Honeywell under the MHRA.

## Background

### I. The Parties

TRI is a privately held Minnesota corporation that manufactures and sells recycled toner cartridges for laser printers and facsimile machines. (See Compl. ¶ 3, Boise Amended Answer ¶ 4; Thomas Dep. at 22.) Joseph Thomas, a former Honeywell employee,[3] founded TRI in 1991 together with five other individuals. (See Thomas Dep. at 7, 12-13.) From 1991 until July 1998, Thomas worked at TRI and was its co-president, with Ron Armant, from time to time. (Aff. of Joseph Thomas ¶ 1; Aff. of Ron Armant ¶ 1.) At the height of its operations, in 1998, TRI employed fifty-four people; it currently employs seventeen individuals, including Thomas. (Thomas Dep. at 23-24.) Thomas is African-American, and TRI is deemed a "minority-owned corporation."

Defendant Boise is a national retailer of office products. Boise presently sells various brands of office products through a network of forty-five distribution centers located in metropolitan areas throughout the United States, including one in the Twin Cities. (See Moss Dep. at 7.) Boise also maintains a catalogue of products that are distributed on a national basis. Boise sells office products in Minnesota. Boise represents that it is a leader in the resale of office products that are manufactured by minority- and women-owned enterprises. (Compl. ¶ 4; Boise Amended Answer ¶ 5.) Beginning in 1995, Boise began carrying TRI's recycled toner cartridges in the Twin Cities market in

[3] Thomas worked at Honeywell from 1974 until 1990. (Thomas Dep. at 7.)

Minnesota. (Compl. ¶ 6; Boise Amended Answer ¶ 7.)

Defendant Honeywell manufactures and sells a variety of residential and commercial building control devices such as heating, cooling, and security control equipment, as well aircraft component parts. (Honeywell 2000 Product Segment Reports (Iwan Aff. Ex. B); Honeywell 1999 Annual Report (Id. Ex. C).) In late 1999, Allied Signal, Inc. ("Allied") purchased Honeywell and merged Honeywell into Allied. Shortly after this merger, Boise lost the Honeywell account and never regained it. (Ruffin Dep. at 103.)

## II. TRI's Relationship with Boise and Honeywell in 1998

The events that underlie the parties' dispute occurred in 1998. In early 1998, Boise and Honeywell entered into a "Proprietary Master Agreement Purchase of Office Products." (Iwan Aff. Ex. D.) Pursuant to this agreement, Boise obtained a position as a preferred source of office products and supplies to Honeywell. Boise agreed that Honeywell divisions could purchase products directly from Boise at specified prices. (See Plantan Dep. at 72.) For its part, Honeywell made no commitment to purchase any specific products or any set volume.

TRI asserts that, in the spring of 1998, its representatives began talking to Boise about selling its toner cartridges nationally through Boise.[4] (Thomas Dep. at 55.) Those

[4] Sharon Grass, a sales representative for TRI, spent approximately half of her time working closely with Boise. (Mott Dep. at 27.) In the spring of 1998, Grass left TRI and no one was hired to replace her. The persons who took over as TRI's primary sales

discussions culminated in a June meeting attended by Bruce Moss, general manager of Boise; Bill Souvignier, regional sales manager for Boise; David Plantan, national sales manager for Boise; Ron Armant, TRI's president for sales and administration; and Joseph Thomas, TRI's president of operations. (Id.) There was no written agreement between Boise and TRI requiring Boise to purchase TRI cartridges, nor was there a written agreement obligating Boise to distribute TRI products either nationally or locally. (See Mott Dep. at 32-33; Thomas Dep. at 53-54; Waulk Dep. at 22-24.) There also was no written contract between either Honeywell and TRI or Boise and TRI requiring the purchase of TRI products by Honeywell. (Answers to Requests for Admissions Nos. 1-2 (Iwan Aff. Ex. A).)

In July 1998, Paul Ruffin assumed the role of Boise's corporate manager of minority business supplier development and diversity. (Ruffin Dep. at 26-27.) Ruffin corresponded with Armant in September 1998 about placing TRI's product in the national Boise catalog – it was too late, however, to consider TRI for inclusion in the 1999 catalog. (Id. at 63-64.) In the fall of 1998, Boise coordinated a meeting in Minneapolis for Honeywell and other businesses for the purpose of introducing those businesses to local minority-owned businesses in and around Minneapolis. At this meeting, Armant

---

contact with Boise were Mike Waulk and Ron Armant. (Armant Dep. at 105.)

met Helen Kimbrough, a minority supplier liason from Honeywell.[5] Armant gave a presentation about TRI's products. (See Kimbrough Dep. at 27-28.) Also representing Honeywell at the meeting was Michael Schneider. (Id. at 28.) Armant was the only individual on behalf of TRI who ever met with a Honeywell representative regarding TRI's product lines. (Thomas Dep. at 153.)

On October 15, 1998, Boise and Honeywell held their annual business meeting in Phoenix, Arizona. (See Compl. ¶ 9; Boise Amended Answer ¶ 10; Honeywell Answer ¶ 10.) At that meeting, Plantan met Michael Schneider, a Honeywell buyer who was Plantan's new contact at Honeywell headquarters. (Plantan Dep. at 31.) Plantan identified TRI to Honeywell as a minority manufacturer that could help Honeywell increase the dollars spent on products purchased from minority-owned businesses. (See Plantan Dep. at 42, 62-63.)

Between October 17 and 20, during a meeting of the National Minority Supplier Development Council ("NMSDC") in Florida, Armant and Kimbrough again met. (See Compl. ¶ 11; Honeywell Answer ¶ 12; Kimbrough Dep. at 38.) Armant spoke to Kimbrough and Ruffin about Honeywell's purchase of TRI toner cartridges nationally through Boise. (Armant Dep. at 77.) TRI asserts that Armant was told that "everything was a go, basically the deal was done," such that Armant assumed that Honeywell and

---

[5] While Armant was with TRI, he did not observe any significant change in the level of business TRI was doing with Boise. (Armant Dep. at 52 (part of Ex. B to the Harper Aff.).) Armant left as president of TRI in November of 1998. (Id. at 114.)

Boise were going to go forward with a national contract. (Id.)

Shortly after these meetings, on October 20, Schneider called Plantan to inform Boise that Honeywell was not interested in buying TRI products and that Boise should stop promoting TRI's products to Honeywell. (Plantan Dep. at 31, 39; Schneider Dep. at 15-16.) Schneider told Plantan the reason for Honeywell's position was because one of the principals of TRI had previously sued Honeywell.[6] (Schneider Dep. at 16.) Although Plantan tried to probe deeper into the reason for Honeywell's decision, Schneider was "reluctant to give him any additional information."[7] (Id.)

Plantan reported his conversation with Schneider to Moss, his direct supervisor. (Plantan Dep. at 42.) Plantan also called Souvignier and relayed Schneider's comments to him. (Id.) Souvignier in turn called Joseph Thomas as TRI. (Souvignier Dep. at 102; Thomas Dep. at 54.) Thomas reports that Souvignier told him that Honeywell did not want to do buy TRI products "because of him." (See Thomas Dep. at 83.) Thomas told Souvignier that he thought Honeywell's decision might have to do with a lawsuit he had brought against Honeywell several years earlier. (Souvignier Dep. at 103.)

---

[6] Schneider consulted with his superiors and with Honeywell's Law Department and recommended that Honeywell not do business with TRI on the grounds that it would be imprudent for Honeywell to have further dealings with a business in which a former employee who had sued Honeywell was involved. (Schneider Dep. at 20-22.)

[7] Schneider does not believe that he told Plantan who the principal was who had sued Honeywell. (Schneider Dep. at 16.)

Nevertheless, between September 1998 and November 1999, local divisions of Honeywell placed at least twelve orders with Boise for TRI cartridges (totaling approximately eighteen cartridges). (Kimbrough Dep. at 64-71; Honeywell Invoices (Ex. C. to Harper Aff.).) Boise filled those orders. Honeywell's corporate headquarters do not control the purchasing decisions of local divisions; the divisions can choose to purchase office supplies using the corporate agreement or not. (Schneider Dep. at 30.)

In January or February 1999, Joseph Bell, then TRI's president, met with Plantan, Souvignier, and Moss to discuss why Boise sales had dropped. (Compl. ¶ 14; Boise Amended Answer ¶ 15.) Souvignier does not recall any discussion or statement regarding why Honeywell had decided not to buy TRI products. (Souvignier Dep. at 112.) From October 1998 to the present, TRI has continued to sell products to Boise. (Thomas Dep. at 96.) TRI alleges that after and as a result of the October 20th telephone call from Schneider to Plantan, TRI's sales to Boise dropped from an average of $37,607 per month to an average of $20,148 per month. TRI has sold and continues to sell its products to Boise competitors and to end-users who are not Boise customers. TRI's sales of cartridges to Boise represents approximately 17% of TRI's revenues.

The highest total annual sales volume for TRI was in 1997, when TRI had approximately $3.1 million in sales. Total sales for TRI in 1998 were approximately $2.8 or 2.9 million; for 1999, they were approximately $2.3 million; and for 2000, they were approximately $1.3 million. (Thomas Dep. at 25.) In addition to its sales to Boise, TRI's

sales fell off to three other major accounts from the 1997 time frame: 3M, Target, and Staples. (Thomas Dep. at 31.)

## Analysis

### I. Standard of Decision[8]

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See

---

[8] Boise filed its motion as a motion to dismiss or, in the alternative, for summary judgment. Under Federal Rule of Civil Procedure 12(b), where the Court considers matters outside the complaint, it shall convert a motion filed pursuant to Rule 12(b)(6) to one for summary judgment under Rule 56, provided that the opposing party is given a reasonable opportunity to present all material information to allow the court to decide the motion. Fed. R. Civ. P. 12(b). Here, Plaintiff has submitted ample evidence in support of its claims. Accordingly, the Court will treat Boise's motion as one for summary judgment.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## II. The Federal Claims

### A. Violation of 15 U.S.C. § 1 (against Honeywell and Boise)

Section 1 of the Sherman Act provides that

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1.[9] To succeed on a section 1 claim, TRI must "provide proof of an illegal contract, combination, or conspiracy which results in an unreasonable restraint of trade."

---

[9] TRI asserted antitrust claims against Boise and Honeywell under both the Sherman Act, 15 U.S.C. § 1, and Minnesota's antitrust statute, Minn. Stat. § 325D.51. Minnesota anti-trust law is interpreted consistent with the federal court's construction of the Sherman Act. Lamminen v. City of Cloquet, 987 F. Supp. 723, 734 (D. Minn. 1997) (Davis, J.) (citing State by Humphrey v. Road Constructors, Inc., 474 N.W.2d 224, 225 n. 1 (Minn. Ct. App. 1991)).

Double D. Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 558 (8th Cir. 1998), (citing State Oil Co. v. Khan, 118 S. Ct. 275, 279 (1997)); see also Lamminen v. City of Cloquet, 987 F. Supp. 723, 733 (D. Minn. 1997) (Davis, J.).

> The Supreme Court in Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 & 768, 104 S. Ct. 1464, 79 L.Ed.2d 775 (1984) and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S. Ct. 1348, 89 L. Ed.2d 538 (1986), provided the standard used to determine whether the plaintiff's evidence of a section 1 violation survives a summary judgment motion. In order to state a section 1 case, plaintiffs must present evidence that "tends to exclude the possibility of independent action" by the defendants. Monsanto, 465 U.S. at 768, 104 S. Ct. 1464. This means that conduct that is "as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588, 106 S. Ct. 1348.

Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028, 1032 (8th Cir. 2000) (en banc). TRI asks that the existence of an agreement in restraint of trade be inferred from (1) the fact that Honeywell was a large and important customer of Boise's, (2) the October 20, 1998 telephone call from Honeywell to Boise in which Honeywell told Boise that it did not want to be supplied with toner cartridges from TRI under Boise's national contract, and (3) certain events that followed the October 20 telephone call. TRI argues that, from the foregoing, a reasonable inference can be drawn that Honeywell told Boise that it should take various actions to hurt TRI's business, including raising prices on TRI products to certain customers, excluding TRI from presentations, and failing to fill orders on TRI products ordered on a nation-wide basis.

While TRI is correct that a conspiracy cannot always be established by direct

evidence and must, in some cases, be inferred from circumstantial evidence, TRI does not acknowledge that there are limits on what the Court can legitimately infer from circumstantial evidence. The lack of an economic motive for a conspiracy bears on the range of permissible conclusions to be drawn from ambiguous evidence. Where the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Matsushita, 475 U.S. at 596-97. The inference of conspiracy must be shown to be "reasonable in light of the competing inferences of independent action." Id. at 588.

Ultimately, the Court cannot conclude that TRI's evidence "tends to exclude the possibility that the alleged conspirators acted independently." Matsushita, 475 U.S. at 588. TRI has failed to articulate a rational economic motive for Honeywell and Boise to injure TRI's sales. TRI's conspiracy argument essentially depends upon the premise that, if certain events occurred after the October 20 telephone call from Honeywell, they must have occurred because of the October 20 call. There is evidence, however, regarding each of Boise's allegedly harmful acts that is at least equally consistent with independent action. For example, the drop in Boise sales of TRI products in November 1998 appears dramatic. Comparing 1998 to prior years, however, demonstrates that similar drops occurred between October and November 1997, and October and November 1996. (See Iwan Aff. Ex. F.) Boise's failures to fill orders for TRI products from companies

ordering from outside Minnesota are equally explainable as being attributable to the customers' access to stock keeping unit numbers ("SKUs") in Boise's central database, from which a customer may not be able to tell whether a product is available nationally or merely locally. As for customers TRI has identified as having been "lost" due to Boise's price increases, the only two customers TRI has named stopped buying all office products – not just TRI cartridges – from Boise. (See Aff. of Elizabeth Grady, ¶¶ 29, 30.)

The Court concludes that TRI has failed to establish a central element of its section 1 claim – an agreement to act in restraint of trade. Accordingly, the Court finds it unnecessary to consider the parties' arguments concerning other elements of the section 1 claim, such as whether the alleged wrongful conduct constitutes a per se violation or is subject to the rule of reason, or whether TRI has come forward with sufficient evidence of antitrust injury to give rise to a genuine issue of material fact on that issue.[10] The antitrust claims against Boise and Honeywell will be dismissed.

## B. Impairment of contract in violation of 42 U.S.C. § 1981 (against Honeywell)

Section 1981 provides that

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . .

---

[10] The Court has serious reservations about TRI's ability to establish a per se violation of section 1 of the Sherman Act on a theory of price fixing. The Court also concludes that TRI has failed to establish an injury to competition; TRI's theory that its product is "unique" is not borne out by the record before the Court.

42 U.S.C. § 1981(a). TRI specifically alleged that Honeywell "engag[ed] in purposeful racial discrimination against TRI, through interference with TRI's contractual relationship with Boise and with TRI's right to the enjoyment of all benefits, privileges, terms, and conditions of its contractual relationship with Boise." (Compl. ¶ 16.) TRI's theory of liability has changed, however. In opposition to summary judgment, TRI does not contend that Honeywell's actions were motivated by a discriminatory animus against TRI, but rather were motivated by a desire to "retaliate" against Joseph Thomas, an African-American owner of TRI and former employee of Honeywell, for having previously sued Honeywell alleging racial discrimination.

There are two problems with TRI's "retaliation" theory. First, TRI did not plead a claim of retaliation. It has only alleged that Honeywell's actions were motivated by the fact that TRI was a minority-owned business. (See generally Compl. ¶ 16, 17, 19, 22.) In the context of construing EEOC charges, the Eighth Circuit has repeatedly held that a claim of race discrimination is separate and distinct from a claim of retaliation. Williams v. Little Rock Munic. Water Works, 21 F.3d 218, 223 (8th Cir. 1994); see also Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 837 (8th Cir. 2000); Artis v. Francis Howell North Band Booster Ass'n, Inc., 161 F.3d 1178, 1183 (8th Cir. 1998). The Court concludes that, similarly, where a minority-owned business asserts a claim of discrimination under § 1981, a claim based upon retaliation is conceptually and fundamentally different from a claim based upon a discriminatory animus against the

corporation as a minority business. Honeywell objects that it has been prejudiced by TRI's eleventh-hour change in legal theory. The retaliation claim certainly is beyond the scope of the Complaint. TRI appears to have had knowledge of the basis for a "retaliation" theory at the time it filed suit in that Joseph Thomas testified that he was told by Souvignier that Honeywell did not want to do business with TRI because of him. Honeywell has not had adequate notice of the claim. Therefore, the Court will not permit TRI to assert retaliation at this late stage in the litigation.

Even if TRI were allowed to proceed with a "retaliation" claim, such a claim lacks an adequate basis in the law. TRI has cited case law holding that (1) a corporation may sue under § 1981 where it is injured by racial prejudice directed at a corporate employee, and (2) a retaliation claim under § 1981 will lie where a former employer takes an "adverse employment action" against its former employee (e.g., failing to rehire him or failing to provide references). See Carr v. Health Ins. Plan of Greater New York, Inc., No. 99 CV 3706, 2001 WL 563722, at *2 (S.D.N.Y. May 24, 2001); Rosales v. AT&T Information Sys. Inc., 702 F. Supp. 1489 (D. Colo. 1988). From these two holdings, TRI asserts that a corporation may recover under § 1981 from a company that is the former employer of a corporate owner, officer, or director, where that company refuses to contract with the corporation due to racial discrimination litigation that the former employee had pursued against the former employer.

As a threshold matter, the Court is concerned that it is not TRI itself that engaged

in any "protected activity"; rather, the "protected activity" TRI asserts is attributable to a shareholder of the company. The Court further observes that the district court in Carr had reservations about the rule of law it was applying. The Carr court expressed serious concerns about "extending the scope of an 'adverse employment action' to include a failure to rehire an individual in litigation with his former employer," because "[s]uch a rule creates a worrisome opportunity for the manufacture of frivolous claims." Carr, 2001 WL 563722 at *3. The Carr court further noted that "[t]he very existence of litigation between an individual and his former employer indicates that a serious breakdown in that relationship has occurred." Id. The Court has grave concerns about a rule of law requiring a former employer to contract with a company owned by a former employee who has sued under a civil rights statute and lost. In the absence of binding Eighth Circuit authority compelling such a result, the Court declines to create such a rule.

Returning to the § 1981 claim as pleaded in the Complaint -- racial discrimination against TRI -- such claims are generally evaluated on summary judgment under a McDonnell Douglas burden-shifting analysis.[11] See Bogren v. Minnesota, 236 F.3d 399, 409 (8th Cir. 2000); Meyers v. Ford Motor Co., 659 F.2d 91, 93 (8th Cir. 1981). Under this burden-shifting analysis, the plaintiff must articulate a prima facie case of racial discrimination. Once a prima facie case has been presented, the burden shifts to the

[11] The burden-shifting analysis applies in the absence of direct evidence of racial discrimination. Plaintiff does not argue the existence of such direct evidence, and the Court concludes upon a review of the record, that there is no such direct evidence here.

defendant to articulate a legitimate non-discriminatory reason for the complained-of conduct. As the Eighth Circuit has recently explained:

> once the defendant produces evidence of a reason other than discrimination for the adverse employment action, "the McDonnell Douglas framework," with its burdens and presumptions, disappears, and the only remaining issue is "discrimination vel non." . . . If the plaintiff adduces evidence that the [defendant's] proffered reason is false, both the prima facie case and the evidence of pretext are relevant on this ultimate question, and they may suffice to sustain a finding of intentional discrimination. . . . However, proof that "the [defendant's] proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct."

Cha v. Henderson, 258 F.3d 802, 805 (8th Cir. 2001) (internal citations to Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097 (2000) omitted).

The Court assumes arguendo that TRI can establish a prima facie case of racial discrimination against the company. The Court also concludes that Honeywell has articulated a non-discriminatory reason for its decision not to purchase from TRI. Honeywell has presented evidence that Schneider recommended that Honeywell not purchase products from TRI through Boise in light of prior litigation between Honeywell and one of the principal shareholders of TRI, Joseph Thomas, a former Honeywell employee. Honeywell had placed Thomas on a six-month leave of absence in 1990 and thereafter terminated him following (1) an internal investigation into allegations by a female co-employee (with whom Thomas had been involved in a romantic relationship) of verbal and physical abuse by Thomas, and (2) Thomas's failure to comply with

remedial measures established by Honeywell's Human Resources department. Thomas v. Honeywell, Inc., No. C8-94-29, 1994 WL 495087 at * 1 (Minn. Ct. App. Sept. 13, 1994). Thomas sued Honeywell alleging that he had been discharged on the basis of his race and had been defamed.[12] Id. The trial court granted Honeywell summary judgment on Thomas's racial discrimination claim because Thomas failed to make out a prima facie case of race discrimination; that decision was affirmed by the court of appeals on a de novo review. Id. at *6. Thomas also appealed from a judgment of dismissal on his defamation claim, which ruling was also affirmed. Id. at *1-5. Honeywell's litigation with Thomas lasted over three-and-a-half years.

The Court finds that Thomas has not come forward with sufficient evidence from which a jury could determine that Honeywell's stated reason for not wanting to do business with TRI -- its prior experience with Thomas -- was a pretext for racial discrimination against TRI as a minority-owned business. Accordingly, summary judgment on the § 1981 claim is proper.

## III. State Law Claims (against Honeywell)

### A. Business Discrimination (Minn. Stat. § 363.03, subd. 8a(c))

Section 363.03, subdivision 8a(c), of the Minnesota Statutes provides that:

> It is an unfair discriminatory practice for a person engaged in a trade or business or in the provision of a service . . . to intentionally refuse to do

[12] Plaintiff's counsel in this lawsuit also represented Thomas in his lawsuit against Honeywell.

> business with, to refuse to contract with, or to discriminate in the basic terms, conditions, or performance of the contract because of a person's race, color, sex, sexual orientation, or disability, unless the alleged refusal or discrimination is because of a legitimate business purpose.

Minn. Stat. § 363.03, subd. 8a(c). A person, for purposes of the Minnesota Human Rights Act, includes partnerships, corporations, and other business organizations. Minn. Stat. § 363.01, subd. 28.

As a threshold matter, Honeywell raises a statute of limitations defense to this claim. The MHRA has a one-year statute of limitations. Minn. Stat. § 363.06, subd. 3. TRI commenced this lawsuit in June 2000. Honeywell argues that the allegedly discriminatory acts TRI complains of occurred between October 1998 and January 1999. Furthermore, Honeywell argues, TRI certainly knew about the facts underlying the claim -- Honeywell's decision not to buy TRI products -- no later than January 1999. Therefore, TRI brought its claim about five months too late.

TRI responds that the telephone call from Honeywell is not the date the cause of action accrued because it was only "the beginning of an agreement between Honeywell and Boise, initiated by Honeywell, to harm TRI." (Pl.'s Mem. Opp'n to Mots. for Summ. J. at 32.) In an ambitious stretch of inferences, TRI argues that Boise's ability to retain its contractual relationship with Honeywell was contingent upon Boise carrying out the parties' agreement to harm TRI. TRI's reasoning is as follows:

- Honeywell was a significant customer of Boise;

- Honeywell "used its clout" to tell Boise that it did not want TRI's products distributed within Honeywell (and – TRI asks the Court to infer – to anyone else);

- Boise "did as it was told," no longer promoting TRI's products with the same vigor as it had before the telephone call from Honeywell, raising prices on products, telling TRI's "major" customers that its products were unavailable, etc.; and

- The manager who received the telephone call from Honeywell about not purchasing product from TRI (who is also the manager who signed the national contract with Honeywell) accepted a "supplier of the year" award from Honeywell in 1999 on behalf of Boise.

The inferences proposed by TRI are simply not reasonable in light of the undisputed facts that (1) Boise continued to sell TRI product after October 1998, and (2) Boise's monthly sales of TRI product in July, August, and September 1999 -- about nine months after the telephone call from Honeywell -- were only slightly below the $30,000 per month level they had been at in October 1998. No jury could reasonably draw the inferences from that evidence that TRI has urged upon the Court. The cause of action clearly accrued no later than January 1999 and, therefore, the MHRA claim will be dismissed on statute of limitations grounds.

## B. Tortious interference with contract

Under Minnesota law, a claim for tortious interference with contract involves the following essential elements: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of the contract's breach; (4) absence of justification; and (5) damages caused by the breach. See Furlev Sales & Assoc., Inc. v. North Am.

Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982). TRI alleged in its Complaint that Honeywell "was aware of TRI's contract with Boise for the marketing and distribution of TRI's products," and intentionally and wrongfully procured the breach of the contract. At the hearing on the defendants' motions, however, TRI's counsel's confirmed that no breach of contract has been asserted against Boise. Nor docs it appcar from the uncontroverted facts that Boise ever ceased marketing or distributing TRI's products. TRI has not established an essential element of its tortious interference with contract claim. That claim will be dismissed.

**C. Tortious interference with prospective business relationships**

"To establish a claim of tortious interference with a prospective business relationship, a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." Hunt v. University of Minn., 465 N.W.2d 88, 95 (Minn. App. 1991) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982)). "Without evidence that a defendant's wrongful conduct influenced a prospective customer's decision to enter into a contract, summary judgment is appropriate." Sports & Travel Marketing, Inc. v. Chicago Cutlery Co., 811 F. Supp. 1372, 1382 (D. Minn. 1993) (Doty, J.).

TRI contends that it had a strong relationship, good reputation, and history of doing business with Boise which had brought about excellent opportunities with Boise to enter into national contracts. TRI argues that there was an abrupt change in its

relationship with Boise after Honeywell's telephone call and that, after the call, Boise took adverse actions against TRI. TRI has not, however, identified any companies that might have bought TRI's products through Boise but did not do so due to Honeywell's telephone call to Boise. Nor is there any evidence that Honeywell knew about such potential business relations. As TRI has failed to come forward with evidence relating to any prospective customer who was influenced by Honeywell's conduct not to enter into a contract, summary judgment on this claim is appropriate.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT**

1. Defendant Honeywell, Inc.'s Motion for Summary Judgment (Doc. No. 15) is **GRANTED.**

2. Defendant Boise Cascade Office Products, Inc.'s Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. No. 20) is **GRANTED.**

3. The Plaintiff's Complaint is **DISMISSED WITH PREJUDICE** in its entirety.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 15, 2001

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: OCT 15 2001

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*